Will the lawyers please identify themselves? Yes, good morning, Your Honor. My name is Stephen Glink, G-O-I-N-K-M-N-F-U-R-N-D-O. Kevin Chau. Lee Louder on behalf of the Chicago Board of Education. All right. Thank you very much, both of you. We've all read the briefs, and we'll just begin with Mr. Glink. Thank you, Your Honor. Before I start my argument, I would ask any of your honors if you have any questions of me or if you have specific issues that you would like me to address first. No specific issues to address first. You know, I would say that as I was reading the brief, your briefs, I thought that maybe there was, even before I read the appellee brief, that maybe there was either an intentional or unintentional attempt to conflate transactional and use immunity because it seems like you hinge much of your argument on the type of immunity that would be given. You've been spending a lot of time talking about that, and really it seems pretty clear that what we're talking about here is not transactional, but use immunity that would be granted by the statute. Well, I agree that it would be, if any immunity was authorized, it would be use immunity, but I did hold out the possibility that the way the statute is written and the Notice of Administrative Rights form is worded, theoretically it could be construed as transactional. By whom? Well, I think, again, if you look at the wording of it, it talks about that the statements cannot be used in any subsequent prosecution or criminal proceeding. Right. So, to me, it doesn't necessarily relate to the particular, at least specifically it doesn't relate to the issue for which the employee may be under investigation because it is broadly worded. It doesn't say it can't be used in any prosecution, or excuse me, that it can't be prosecuted for that. It does say that the statements that he makes cannot be used even derivatively in any future prosecution. I agree with that. And, again, I think, as you know, sometimes the statements are the state's only evidence. So, again, theoretically it could turn into a transactional situation, although I think the wording of the form tries to confine it to use immunity. For example, if he was already charged with a crime, so that's what they were investigating. So, investigating a crime that has already been charged, it makes it very unlikely that statements that have not yet occurred would be the only evidence of a crime because he wouldn't have been probably charged if there hadn't been either statements made prior, which, of course, wouldn't be affected by any immunity granted for any statements he makes during the interview with the Board of Education, or there could be evidence of a completely different nature, such as in this case when there were alleged eyewitnesses. Well, again, how I look at this is the possibility of what statements could come out in an interrogation. And, again, I think you as justices and judges know sometimes there's the open-ended questioning at the end where the investigator or the police officer says, you know, is there anything else you think I should know or is there anything else you want to tell me? And the defendant or the employee in this case may say, well, I didn't do this, but I did have drugs on me. Forgetting about the pro for immunity that might have taken place between the OIG and your client, do you question the fact that there is protected immunity, whether pro for it or not, based on the Garrity case and its progeny so that even if the pro for were misguided in using the word subsequent, would that be the case under the so-called automatic immunity that would necessarily ensue? Well, I think in response to your question, my answer would be I think there has to be an effective pro for immunity. And I think the Garrity case and the Lefkowitz case established that, that if there is no immunity offered or not effective immunity, then... Well, subsequently, the Gardner case and other cases as well have modified or have construed the Garrity case to those cases in which blanket waiver of immunity was required as opposed to those cases that did not actually require an immunity, as was the case in Garrity. And where no waiver of immunity is sought, immunity is automatic in the sense that even if it's not pro for it, it would not withstand challenge if at least the use immunity were violated. Well, again, my position on that might be a little different than the way you're interpreting it, because I don't believe that immunity is a blanket option. I think an employee or a defendant or a suspect comes into an interrogation with the right against self-incrimination. Now, we all know that many times they voluntarily give up that right. But in a case where the suspect, the employee, the defendant or whomever is sitting there and let's take this case... So he's entitled to some sort of reasonable notice and the posner comment about the fiction that everyone is presumed to know the law would be honored only as a fiction. But where you're represented by counsel at that proceeding, can't that notice be presumed at that point, at least in the Atwell case, posner seems to make that distinction. Well, what I think is this. There is absolutely no statutory authority for the inspector general to confer immunity or even offer immunity. If you look at the statute, 13.1D... Are you talking about transactional immunity or use immunity? I'm talking any kind. Well, that is a question not necessarily to be exclusively yours. But I am interested in that question from your opponent more so even than from you, whether the presumed immunity that follows under the Gardner approach is how that manifests itself in actuality. Or let's put it this way. Does the use immunity require specific authority on the part of the interrogator? If the interrogator has an authorized right to interrogate, but no specified right to grant any kind of immunity, use or otherwise, is that authority to grant the use immunity implied? Granted, the attorney general and the state's attorney have to concur with respect to transactional immunity, but does that requirement also apply to the granting of use immunity based on the constitutional right, which the Supreme Court made eminently clear, cannot be coerced away even under the use immunity? Or does that require the threat of losing one's job, which is a sufficient threat to constitute coercion? Here's how I would respond to Your Honor's question. My client was put in a sort of pick-your-own-poison sort of situation here. He could either, on the advice of two attorneys, go to the inspector general's office, remain silent, and then, knowing he's going to be fired, but not possibly incriminate himself, or he could have answered these questions at the risk of incriminating himself and hoping that the trial judge in his criminal case would say, listen, there's implied immunity here, and hoping that the Cook County state's attorney would say, well, there's a form that he signed, and although we didn't agree with it, we didn't authorize it, we're not any part of that agreement, we'll agree to be bound for it. I think that's a big risk for my client. Let's put that statement perhaps in a narrower and a more compact posture. Are you basically saying that if there was an official grant of immunity, in other words, where the authority to grant such immunity is not open to question, that even so, reliance on attorneys would be sufficient to avoid the fulfillment of the threat of termination? Or does that only apply where there's some question? And then, does that become a question of fact, whether there is in fact a sufficiently verifiable, reliable authority in the law to make clear that the immunity could be claimed, notwithstanding whatever answers to questions may be required? And if that's the case, then you can't simply rely on the advice of counsel, unless advice of counsel is somehow a built-in protection against any kind of termination, whether constitutionally valid or not. I believe if the prosecuting authority has officially conferred immunity, as was the case in the Scherer case that is actually cited by my opponent, then reliance on the attorney's advice at that point is not reasonable, because there is an official grant on record written, signed by the prosecuting authority. But in this situation, where he's informed of his obligations under the applicable laws, in reliance on the Atwell decision, which states pretty clearly, albeit Seventh Circuit, not other circuits,  then the government is not allowed to force a person to make a statement, even out of court, that might be used as evidence that he committed a crime. It's not even allowed to pressure him into cooperating by threatening to fire him, if he's a government employee, for his refusing to provide such evidence. It has every right to investigate allegations of misconduct, including criminal misconduct by its employees, and even force them to answer questions pertinent to the investigation. But if it does that, it must give them immunity from criminal prosecution on the basis of their answers. So really what we have there is a clear statement, at least in this federal circuit, that what occurs in these circumstances is that once you're given that really lack of choice, if you want to preserve your employment, that immunity is there for the use of the statements that are made. Well, I'll say this. I agree with the statement of law to a point. And again, I think what it really comes down to is, was there a proper conference of immunity on my client at that time? I don't think there's any question, as I said in the Scheer case, if the prosecuting authority grants immunity, that's fine. But as we all know, police are allowed to use trickery to extract confessions, and even judges are not legally empowered to grant immunity. So part of the big question in response to what Your Honor said is whether there was an effective grant of immunity in this case. They really are, because in the case of use immunity, they hold the keys to what would be admitted in evidence. And since it's not transactional immunity that we're speaking of, Mr. Klink, should somebody try to introduce a statement that was given with this type of a requirement, that they do this to protect their job, with the precedent that that can't be done, you can't compel the answers or even pressure the answers without granting the immunity in that situation, the judge would be absolutely empowered to say to the prosecuting authority, should they try to use it, you may not use this evidence in this case. I agree that the judge would have the authority to make that ruling. Whether the judge would make that ruling I think is a major question of fact and law, because the prosecuting authority is not a part of the agreement. So I think the question would become that. By implication, isn't that exactly what they are? Well, I think implication. But again, if you're looking at my client's situation as an employee who's sitting there with a lawyer who has a separate criminal defense lawyer that's telling him to keep quiet because you're at risk and there's no official grant from the state's attorney's office, I think he's in a very, he's in a precarious position beyond belief. Except for the fact that, you know, as you yourself were even alluding, there are different agencies and different prosecuting authorities within a municipality, for example, within a county, within several neighboring counties, within the U.S. attorney's office. And so really what you have to rely on is not that you can get every potential agency that could possibly prosecute somebody, but more looking at the nature of the immunity that's granted because of the circumstances under which the statements are made. I think it's all a part of the factoring process where the judge assigned to the criminal case would make a determination if the state tried to use the statements as evidence. This is a softball to you for a moment, but pertinent, I think, to the issue under discussion. But it's something that I would be curious to have Ms. Lauder address. All of these precedents in which the Supreme Court decided that you cannot be coerced to give away your right to at least use immunity as a tradeoff for the waiver of your Fifth Amendment right. If you don't have a formal offer of immunity, how do you know that this isn't a genuine waiver as opposed to a coerced tradeoff or as a coerced give up? In other words, it's clear, I think, that that's kind of an oxymoron, isn't it? It's clear and I'm still thinking about it. Well, I think as a lawyer that would be my concern in advising this client. You don't know. But the question is, if in fact a defendant says, I don't want protection, you know, like in that movie A Few Good Men or something where he says, no, I don't want immunity, then it's clear he's waiving it. The Supreme Court is not going to come along and say, you may not want it, but you get it anyway. You only get it if it's coerced. Okay? Now, how do you know? Under what are the circumstances that would distinguish between a genuine waiver and a coerced waiver? In the one case, the immunity would nevertheless survive. In the other, I don't see that it would survive. So the question is, do you need the intermediary, namely the government interrogator, to make some sort of proffer and to provide some formality of the acceptance of the proffer before you would know? Or at least you would require a statement from the defendant. I don't want to lose my job. You're forcing me, so okay, here's the answer. Is that what is going to be necessary in order to preserve your immunity, notwithstanding no formal authorized offer of immunity is interposed? Well, I think the whole point of it is that my client was sort of in no man's land there at that time, and even if he were to qualify his statement by saying, well, I don't really want to voluntarily give up my right, but you're forcing me at gunpoint because it's either that or I'm fired, here's my answers to your question. So I don't know that even that's enough to constitute a freely and voluntarily given waiver. Of course, you see in situations that this doesn't just apply to teachers. Police officers, as a part of their disciplinary investigations, have this happen over and over again, and anyone who has read those has seen that there's always a statement made by the defendant or his attorney at his attorney's request saying, I'm only answering these questions because of the fact that I would lose my job if I didn't answer them. And on they go. Well, again, they may be making their record for the criminal case that's sure to follow. Well, it's not sure to follow. I mean, they may be innocent completely, as your client may be innocent completely, but it's a question that they just simply make a statement that the only reason we're giving up our right to remain silent is because we've been told that we're going to lose our job as a result of not answering. Right. I understand that that's happening. I also understand that in some of the collective bargaining agreements there is an immunity provision. There would have to be payment under protest, presumably, under that scenario. And it makes it a little awkward, and I'd be curious to know at what point does the failure of the defendant to yield his Fifth Amendment right provide the grounds necessary for termination without the certainty that would ordinarily be provided if a formal offer were made, And if a formal offer is necessary, then we're back to square one. Was the OIG authorized to make any formal offer? And more generally, is any government-authorized interrogator, does such an authorized interrogator always carry a concomitant right to provide the use of immunity that would be necessary to compel a Fifth Amendment waiver at risk of employment? That's a thoughtful question. Do I still have time? Because there are some other questions. Technically, your client was fired for a criminal act, and that criminal offense was not answering the questions. Ignorance of the law is not an excuse for him. How do we get around that? My position is this. The statute that makes the failure to cooperate a crime, that's not technically a double jeopardy, but it's certainly a double whammy. In the sense of, I think we all know from the line of school cases that criminal offenses are irremediable cause for discharge. This is more or less what we call a status offense. It's not inherently wrong not to answer the inspector general's questions. It's only a misdemeanor because the legislature said it's a misdemeanor. And in my view, to criminalize a person for invoking his federal constitutional right not to incriminate himself, it violates the supremacy clause, and I just think it's terrible public policy to sanction such a thing. The charges here are not clearly defined. And so that to what extent is the underlying putative of, well, I can call it an offense because he admitted he pled guilty to it, to what extent does that enter into the equation to provide a criminal basis for the render the necessity of a warning unnecessary because it would be deemed presumptively irremediable? Well, I think first you have to look at what is on this appellate record. My client was discharged because he did not answer the inspector general's questions. Is that clear from the ruling of the ALJ? It certainly is not clear from the ruling of the board, which doesn't specify at all. Is the ALJ's specification restricted only the refusal to answer, or does it also rope in the underlying offense of public luteness or what have you? The ALJ's decision was only based on the failure to cooperate with the inspector general. In fact, if you look at both briefs, both briefs talk about that Chicago Public Schools lawyers filed a motion to supplement the record, which was denied. So on this record, there is no conviction. Well, there's always some infiltration of the underlying offense. It would seem on the face of it that the refusal to cooperate is the mainstay, but I don't see that the underlying offense is totally eliminated, at least by stipulation or implied stipulation. Well, in the event that Your Honors want to consider that, I believe that the ultimate resolution, at least according to the motion that was filed by the Chicago Public School Trial Council, was that my client did not plead guilty to public luteness. I believe the motion said that my client pled guilty to disorderly conduct. I understand. But whatever it is, whatever the label for it is, and we're not interested in the substance of it, but only insofar as we're only interested in the label, which would be a criminal offense. The generic character of what he pled guilty to is that of a criminal offense. And if a criminal offense is deemed to be irremediable, wouldn't that suffice? Well, I think that's certainly one of the weaknesses in my case. But, again, I think what Your Honors have to look at is the type of offense and the possible reason for the plea. As we all know, criminal defendants often – that if you're convicted of a crime, then why do we look at why he pled guilty? I do think it's important because, yes, on the record, he allegedly pled guilty and was given conditional discharge to a much lesser offense. So I understand the court's concern. And, again, I acknowledge that is a bit of a weakness in my case. But if you look at some of the other cases that are reported – I do believe we do. And, again, like McBroom is a drug case and Payne is a theft case. So I think the quality of the wrong for a teacher is a lot different there. And those were job-related misconduct cases. This certainly is not. And both those cases involved offenses for which a person could not even be hired by the board as opposed to what their client was charged with. Exactly. Do I still have time? What else would you like to address briefly? Well, I think what's important to me is the Section 4 – the Board Rule 4-4M, which really, in my view – Mr. Justice Gordon talked about the separation of powers. I believe that's such an important issue relative to this case because, in that case, the board has declared the failure to cooperate as grossly – that it grossly disrupts the educational process. And if you remember the record, my client was the only one that presented evidence that there was no harm to anybody caused by anything he did, whether – But the question arises, I think, what harm is there to someone who is put in loco parentis to minors as a whole, not necessarily in your client's circumstance, but as a whole when someone is being investigated for alleged criminal activity and refuses to answer, somebody who is entrusted with the care for periods of time of minors? Well, I think that's the situation in any teacher disciplinary case. There is a criminal charge. But they have the opportunity to suspend with or without pay pending the investigation, pending the hearing. That's true no matter what kind of conduct, whether there's a criminal charge or not. And there are cases where teachers are alleged to have physically abused students that are – there is no criminal charge, but it's the nature of the act that's important. But in those cases, under the 1977 Supreme Court decision in Gilliland, every school district, apparently except Chicago, has to prove substantial harm to either the child, the school, the faculty, or the community. And what bothers me about Rule 4-4M is – Is Gilliland's continued vitality questionable in light of – Senate Bill 7? And Atwell? Well, again, Atwell I think is distinguishable, as I said in my brief, because the teacher never showed up. It's not a Fifth Amendment- Right, but if you show up and don't talk, how much different is that than not showing up? Well, again, I think what Atwell was talking about was a federal constitutional right. Any answer to that, Mr. Klink? What's the difference? There is no difference. Okay. But, again, I think on the record, the employee has to assert that privilege. That certainly seems to be required. If there's no other questions, then, I thank you for your time. Thank you, Mr. Klink. Ms. Louder. To begin with, let me ask you why – and I went back to the record to look at this – in the motions that were in the trial court, there was no citation of these – the board delegation or request under the Inspector General statute for the OIG to do this. And then you asserted in your brief, but nobody even argued it or presented it to the project. Isn't that forfeiting there? No, I don't believe it is, because you can affirm the board's decision on any basis that appears in the record. Well, how do we know that that hasn't been abrogated by something else? How do we know anything about it? I mean, presumably, isn't that the type of thing that should have been flushed out at the trial court? I think the reason they didn't flush it out in the trial court is they assumed that the statute, which gave the OIG authority to take any other actions directed by the board, was sufficient to give authority to – Well, how can that be the case when that provision says other actions requested by the board? It doesn't fill the gap. What was requested? And the request that you do have was made in 1998. And it is, aside from that, as Justice Epstein says, points out, I looked at the circuit court's decision to see if they had any inkling of it, and they had none. And they were making the leap between – just the same leap that you're now suggesting, that since the board had authority to request other assistance, that we would simply assume that such other assistance was requested. Also, I don't know that one takes judicial notice namby-pamby. There has to be some special request for it on a motion. And this is a resolution. It is not a regulation. It's not a statute. I don't know. What's the status of a resolution? Do we take judicial notice of ordinary e-mails or records passed between members of the board that don't have some tangible, formalized status? This does have a tangible, formalized status. It's a resolution of the board. What is that? What is a resolution? What was the vote on this resolution? What was the vote count? It was unanimous. Where did it say that? It's in the resolution. I'm looking at it. I'm looking for that. You're looking at the resolution? Yeah. I see the language be it resolved, but I don't see the actual count or any word unanimous. I think we can assume because it was adopted that a majority adopted it. And it's an official act of the board. If we're allowed to really consider that. Right. And if you're not allowed to consider that, does the board have the authority to investigate when its employees are charged with criminal acts? Why not? Why would it? Why wouldn't it? Since the primary appointment of the OIG was to investigate financial improprieties. And investigate to see whether or not a criminal act had occurred. Leaving some door open for other things which are not specified. Ordinarily, justum generis would say other types of financial misadventures. The charge under the state statute, Inspector General shall have the authority to conduct investigations into allegations or incidents of waste, fraud, and financial mismanagement in public education within the jurisdiction of the board, et cetera, et cetera. And then many, many lines later in the last clause of this statute, as I'm sure you're very familiar, Ms. Lowder, says and shall perform other duties requested by the board. One would think under an analogy to justum generis that it would have to partake of the same character of the specified types of activities for which it was appointed to investigate. Well, I think it, what does that language mean? It only is restricted? Then what would be the meaning of that language if you only needed to, if it weren't to say something in addition to financial crimes? Because if that wasn't so, then that resolution, if it were drafted with the greatest economy, would simply say that the Inspector General is there to investigate at the behest of the Board of Education, whatever the Board of Education directs them to investigate. Isn't that what it says in the last sentence? I believe that is what it says. Well, it says other duties. It doesn't even talk about other investigations. And it's difficult to understand why there's a very narrow universe of circumstances which they are specifically told to investigate. And then I guess they don't need the direction of the Board to investigate the financial crime. Right. That would be the logical interpretation of that. And then we have an amorphous clause that, understandably, you are giving the broadest possible interpretation that they could, if the Board asked them to find out what's on the menu at Panera Bread, that would be a duty that would be assigned by the Board. And so why I think it's important that they are able to investigate is the Board's liable if it knew or should have known that one of its employees could cause a risk of harm to its students. The Board sponsored Mr. Chao to come and work with a very vulnerable and heedless group of individuals, high school students, and it needs to be sure that someone who's in that capacity is responsible, has good character and judgment. Does the Board have its own investigators? Yes. So it doesn't simply rely on the OIG as its investigative arm. No. It has its own in-house investigators. But what happens is the Chicago Police Department, when one of our employees is arrested for a sex crime, as was Mr. Chao, they notify the OIG and the OIG begins an investigation. Well, I don't know if you can call this a sex crime, frankly. It was lewdness. I don't know if that's coextensive with sex, to be lewd, and there was some deviation from the pathway that was cut off or prohibited by police order in that particular location. What Officer Harris testified is that she saw Mr. Chao. Yeah, but that wasn't the charge. The charge was public lewdness, which is not synonymous, I think, with sex necessarily. It may involve sex, but it's not a sex crime. Well, even the offense he was charged with, that is not one of the offenses which would cause one to lose their license or under the statute prevent him from being hired as a teacher. Is that right? That's right. So, you know, even if he was guilty, that's not a disqualifying offense, what he was charged with. It's not one of the statutorily enumerated offenses, but I think it shows that he acted both immorally and criminally. And the reason I think he acted immorally, despite what his counsel said, is we sponsored him to come here to teach. If he's arrested, we're informed of that. But then why didn't you have a hearing and make that finding? Instead, you charge him with a criminal offense, you present with it. Let me give you a backup. He comes into the scenario having talked with a private attorney who says, well, you've got to take the fifth on this. You've got a charge pending. He has a union lawyer there. He's depending on a union lawyer. He says, you've got to take the fifth. Then what you do, you give him a piece of paper, and it's not really a notice. It's basically an acknowledgment. You're requesting that he acknowledge things which are totally opposite of what his two attorneys have told him. In other words, you're making him say, nothing can be used against me, which is totally contrary to what his attorney. So there's actually no notice, per se, except for this acknowledgment. Am I correct? What I think the Second Circuit said in the Uniform Sanitation Amendment is once the government entity says you have to answer these questions, your immunity attaches. So just by telling you you have to answer these questions, that's when your constitutional immunity attaches. And, yes, I believe it did attach there in answer to your question before. May I ask a different topic question, please? The crime for which the appellant was discharged was the misdemeanor of not cooperating in the investigation, which in this circumstance derives simply and solely from the exercise of a state and federal constitutional right. How can it be a crime not to waive your constitutional right? It's not a crime not to waive your constitutional right. It's a crime once you've been informed that your statements can't be used against you in a criminal proceeding. But he wasn't informed. He was given an acknowledgment form. Is that being informed? Suppose we had a cooperative person who signed this statement and gave information. What happens next? There's no representation from you or from the board that he was, in fact, coerced into giving this information. I believe that the law assumes the coercion under that uniformed sanitation man. And look at it another way. He did testify. He testified at the discharge hearing. He says we're forcing him to incriminate himself. Well, I think there is a built-in inconsistency, at least to the argument you make in your brief, because when you're challenged on the constitutionality of making a blanket criminal offense out of a refusal to waive one's Fifth Amendment right, you say we don't have to deal with that because he wasn't charged with a criminal offense. Yet you're using that criminal offense to characterize what he was charged with as a remediate, as a basis for saying that no warning is required because it's a remediate. So you're having your cake and you're eating it, too, so to speak. I don't think he can do that. You're the judge. But I'm not a baker. I think you could also find that he acted immorally, and I'd like to make that argument. We sponsored him to come and teach high school students. Well, he was not fired for that reason. That's the thing. Was it immoral for him not to answer the Fifth Amendment? That's why he was fired. I believe it was immoral for him not to answer the questions once he was given immunity, which he was given immunity. The Constitution gives him that. That's what the Atwell case and the uniformed sanitation men. Once we tell him you have to answer these questions or you're going to be fired, the immunity attaches. It doesn't require any questions. I'm still trying to get my head around the fact that the Chicago Board of Education is defining immorality as the exercise of constitutional right. That's not what we're defining it as. We're not asking him to incriminate himself because he said during his discharge hearing that he was running, he got a cramp, he took a detour through a good area. So the content of the statement defines whether he has a constitutional right not to answer the question? What he's saying is that he didn't act criminally. If it's a denial, obviously you take a look at criminal law, it doesn't have to say that you don't presume that the answers will be an admission of guilt to trigger the right not to answer questions when you were being charged with a crime or being investigated for a crime. There's not a presumption that the answers you're not giving would be admissions. And so how is that cured by the fact that when he later decides to testify that he says something consistent with his innocence? So he's not being asked to incriminate himself, right? That's his story. His story is that. That's a unique spin on the jurisprudence around the Fifth Amendment right to remain silent. I don't see that anywhere in the law. He doesn't have a right to remain silent in a civil case if he's given use immunity. That's what the cases say. He doesn't have that right. But you're playing to the hilt the fact that he doesn't have to be given use immunity, whether he's given it or not. And that's problematic as well, isn't it? I don't think it is. Nobody has to proffer it to him since he already has it. No, they're proffering it to him by saying you have to answer these questions. So, in effect, there is no Fifth Amendment protection in this entire area because the very demand for the waiver of the Fifth Amendment automatically produces the use immunity which makes you vulnerable towards being required to waive that immunity without the intercession of any formalized third party. And that's a very difficult concept. You may be right, but it's a difficult one to assimilate. Well, it's the rule in the Seventh Circuit and in the Second Circuit which said the very act of telling the witness that he would be subject to removal if he refused to answer was held to have conflict of such immunity. Well, that invokes, however, there's room in that equation to interpose the has argued that a defendant should not be subject on his own to have to resurrect his right to use immunity through a lawsuit because there's no contract. Well, what troubles me on this case when you say it's irremedial, you know, you go in and you present an individual with something, a paper that says you have rights which his attorneys said he didn't have. And you use that few minutes transaction as the basis to terminate. And you say that coming back and telling the lawyer's witness you're wrong, you've got to use immunity here, you're saying that there's no use to telling the lawyers they're wrong about this and that there is a reason to answer. And you didn't do that. The board gave him the right advice. His attorneys gave him the wrong advice. Is that our obligation? Where does it come irremedial? Why is it irremedial? Both because I think what he did was immoral and because what he did was correct. What was immoral? It was immoral for him when he was questioned by his employer who hired him. As long as you're talking about the questioning, it's immoral for him not to have surrendered his Fifth Amendment right, his refusal, I'll put it in terms that you could live with, that it was immoral for him to refuse to cooperate with the investigation under circumstances where the protections offered by the Fifth Amendment were provided in the form of the use amendment. Yes. That's right. That's what I believe. And I believe it's immoral because the board is liable. If we know or should have known that our employees are causing harm to students, the taxpayers are going to have to pay for that. So don't we have a right to question our employees to find that out? Well, it's difficult to attach the term, the concept of morality to a refusal to incriminate oneself. He's not. You know, that goes back to Roman law. People were not required to incriminate themselves under Roman law. It's a very ancient right. He's not being asked to incriminate himself because he's given immunity. More interesting, I think, is the use. No, he's asked to incriminate himself but he's protected against the use of his verbalized confession. And you're not even discussing the use immunity and whether it could be lost if there was a contrary statement later. I'm not sure I understand. Okay. Well, let's move on. Anything else? No, Your Honor. Thank you. Thank you. Any final words, Mr. Kling? Yes, if I may. I just want to point out three items in response to the questions that Your Honor has posed to my opponent. First of all, if you look at the record at page 93 and 94, the OIG inspector who did the investigation and questioned Mr. Chau testified at the dismissal hearing that he had no specific directive from the board to investigate Mr. Chau. I think that's important. Second, if you look at section 13.1D, there is no mention of refusing to answer the question after an employee is advised of his or her administrative rights or if the employee has been given immunity or proffered immunity. So that's not even in the statute. And last, in the same statute, the employee can be deemed guilty of a misdemeanor if somebody at the Board of Education determines that the employee knowingly gave false testimony, which I believe addresses the question that Mr. Justice House had, where he may not have to say he did it, but if he denies the charge or denies the allegations, then they can turn around and say, well, you knowingly gave false testimony because the two police officers gave a different story, so now you're fired for that. So, again, I think my client was in an indefensible position from the start here. That's all I really have to add. And I will thank both attorneys for fine briefs and fine oral presentations. We will take the case under advisement and issue a ruling in due course, and we will stand in recess.